### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MARCUS J. MOORE** : | |
| c/o Patrick Malone & Associates : | |
| 1310 L Street, NW, Suite 800 : | |
| Washington D.C. 20005 : | |
| : | |
| Plaintiff, : | |
| : | |
| v. : | Case No.: |
| : | |
| **DONALD J. TRUMP** : | |
| The Mar-A-Lago Club : | |
| 1100 S. Ocean Blvd. : | |
| Palm Beach, FL 33480 : | |
| : | |
| Defendant. : | |

## COMPLAINT

1. This is a complaint for damages by United States Capitol Police (USCP) officer Marcus J. Moore for physical and emotional injuries caused by Defendant Donald Trump's wrongful conduct inciting a riot by his followers as they tried to overturn the results of the 2020 presidential election on January 6, 2021.

### I.     THE PARTIES

2. The Plaintiff, Marcus J. Moore, is a USCP officer. He is a resident and citizen of the District of Columbia.

3. The Defendant, Donald J. Trump, was a candidate in the 2020 presidential election. At the time of the riot Trump had not publicly conceded that he had lost his re-election campaign and was instead regularly communicating to his followers that he had prevailed. Trump was the 45th President of the United States, from January 20, 2017, to January 20, 2021. He is a resident and citizen of Florida.

## II.     JURISDICTION AND VENUE

4.     This Court has jurisdiction under 28 U.S.C. § 1332(a)(1) because the parties are of

diverse citizenship. The amount in controversy exceeds $75,000, not counting interest

and costs.

5.     This Court has jurisdiction under 28 U.S.C. § 1331 because Plaintiffs assert claims under

42 U.S.C. § 1985(1).

6.     This Court has supplemental jurisdiction over Plaintiffs' non-federal law claims under 28

U.S.C. § 1367.

7.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b)(2) because most

of the events giving rise to the claims occurred in the District of Columbia.

## III.     FACTUAL BACKGROUND

### A.     Introduction

8.     PFC Marcus Moore is a ten-year veteran of the USCP.

9.     Officer Moore reported for duty on January 6, 2021, without any suspicion that he would

soon become the target of Trump's followers. Those followers had assembled in

Washington at Trump's calling for a rally at the White House Ellipse that quickly led to a

violent insurrection at the Capitol.

10.    The insurrectionists were spurred on by Trump's conduct over many months in getting

his followers to believe his false allegation that he was about to be forced out of the

White House because of massive election fraud by his campaign opponent Joe Biden, and

that the convening of Congress on January 6 to count the Electoral College results and

declare the winner was their last chance to "stop the steal."

11. The insurrectionist mob, which Trump had inflamed, encouraged, incited, directed, and aided and abetted, forced its way over and past Plaintiff and his fellow officers, pursuing and attacking them inside and outside the United States Capitol, and causing the injuries complained of herein.

12. As a result of Trump's speech on January 6, 2021, his conduct and statements leading up to and on that date, and his refusal on that date to tell his followers to stop their continued violence at the Capitol, USCP officers and Metropolitan Police Department officers, including the Plaintiff, suffered physical and emotional injuries. Trump's legal violations include:

- Directing Assault and Battery
- Aiding and Abetting Assault and Battery
- Liability *Per Se* for Violation of D.C. Code § 22-1322 – Inciting to Riot
- Liability *Per Se* for Violation of D.C. Code § 22-1321 – Disorderly Conduct
- Conspiracy in Violation of 42 U.S.C. § 1985
- Civil Conspiracy

**B.     Trump's Conduct Leading Up To the 2020 Presidential Election**

13. At various moments during his 2016 campaign, and throughout his presidency, Trump espoused rhetoric that encouraged violence and glorified acts of violence by his followers, including white supremacists and far right-wing hate groups.

14. Trump's stoking of violence by his followers accelerated during the 2020 presidential campaign.

15. During the first presidential debate between candidates Trump and Biden, held on September 29, 2020, Trump repeatedly asserted, without evidence, that the election would be fraudulent and rigged:

- "There's fraud. They found them [ballots] in creeks... . . This is going to be a fraud like you've never seen;"

3

- "It's a rigged election;"

- "This is not going to end well."

16. Asked during that first presidential debate by moderator Chris Wallace to condemn white supremacists and far right-wing hate groups, Trump responded, "Proud Boys, stand back and stand by." Minutes later, the Chairman of the Proud Boys, Enrique Tarrio, posted a message on Parler, a social networking service popular among extremist groups, saying, "Standing by sir." Prominent Proud Boys member Joe Biggs also posted on Parler: "Trump basically said to go fuck them up. This makes me so happy."

17. The Proud Boys were then standing by on January 6, when they coordinated, instigated, and led many of the most pivotal actions of the rioters' rush into the Capitol Building. At a morning meeting before the Capitol was stormed, Proud Boy Daniel Scott aka Milkshake shouted, "Let's take the fucking Capitol."

18. On December 21, 2021 a junior member of the Proud Boys, Matthew Greene, pleaded guilty in federal court in the District Court to unlawfully conspiring to obstruct Congress from counting electoral votes as set out in the Twelfth Amendment of the United States Constitution.

19. At the first presidential debate, Wallace asked if Trump—whom the Constitution excluded from any official role in the counting of ballots, the counting of electoral votes, or the certification of the election, but who had tremendous sway as a candidate over the conduct of his supporters—would urge his supporters to "stay calm" following the election, and "not to engage in any civil unrest." Trump responded, "If it's a fair election I am 100% on board. But if I see tens of thousands of ballots being manipulated, I can't go along with that."

20.    In October 2020, a group of Trump's supporters forced the cancellation of multiple Biden

Campaign events in Texas after they ambushed a Biden campaign bus.  After that

incident, one of Trump's supporters who was involved in an automobile accident during

the incident with a Biden staffer's car, described his actions on that day as "slamming

that fucker" (referring to the Biden staffer) and "serv[ing] . . . 35 in[ch] tires" in a social

media post shortly after the event. Nonetheless, Trump defended the ambush, tweeting,

"In my opinion, these patriots did nothing wrong." He then tweeted a video of the

incident with the comment "I LOVE TEXAS!"

21.    In the days leading up to the election, Trump repeated his assertion that his adversaries

were "trying to steal" the election, which prepared his followers for more such baseless

assertions once the election was over.

     **C.**    **Trump Lost the 2020 Presidential Election and Immediately Stepped Up His False Claims of a Stolen Election**

22.    On the night of the election, at 2:30 a.m. on November 4, in a small rally held at the

White House, Trump claimed that he had won the election, even though hundreds of

thousands of votes in key swing states were still being counted. As more votes were

counted, particularly from high-population areas, it became increasingly apparent that Joe

Biden had won the election. This prompted Trump to begin repeatedly tweeting that the

election was being stolen:



We are up BIG, but they are trying to STEAL the Election. We will never let them do it. Votes cannot be cast after the Polls are closed!

23. These tweets and related statements, while taking advantage of Trump's platform as President and his ability to incite his followers, were issued in Trump's personal capacity as a candidate for elected office.

24. On November 5, Trump made a statement, "If you count the legal votes, I easily win. If you count the illegal votes, they can try to steal the election from us."

25. On Saturday, November 7, every major news organization in the country called the election for Joe Biden after the count in Pennsylvania showed he held an insurmountable lead.

### D.    Trump Called for a "Wild" Protest on January 6, 2021, and His Words Were a Call to Arms

26. In the weeks following the election, as several states began recounts, Trump continued claiming that the election had been stolen, despite offering no evidence that was found meritorious by any of the dozens of courts that considered his and his allies' post-election lawsuits.

27.     Trump's claims of fraud immediately following the election led to his followers, often

armed, descending on state capitols and other government buildings throughout the

country. Between the election on November 3, 2020, and January 6, 2021, there were

dozens of protests around the country by Trump's followers. Two of these events

occurred in the nation's capital, and at both events police officers were injured trying to

restrain Trump's followers. Trump knew that both events had turned violent.

28.     Trump promoted a rally planned for November 14, 2020, in Washington, D.C.:



29.     On November 14, 2020, Trump followers gathered at Freedom Plaza in Washington,

D.C., a few blocks from the White House, in what would be called the first "Million

MAGA March" (though it was estimated that the crowd numbered in the tens of

thousands). These included members of far right-wing hate groups, including the Proud

Boys, Three Percenters, Oath Keepers, and followers of the QAnon conspiracy theory.

30.    On November 14, 2020, Trump issued numerous tweets about the election being stolen,

while tweeting his support for the rally. He also pushed the idea that rallies like this one

might result in him "winning" the election:





31.     Later in the evening on November 14, violence erupted, as four police officers were injured and over twenty-one arrests were made, including for destruction of property, carrying a pistol without a license, inciting violence, and disorderly conduct.

32.     On December 10, 2020, Trump tweeted, "This is going to escalate dramatically. This is a very dangerous moment in our history." He was quoting one of his supporters.

33.     On December 12, 2020, Trump followers again gathered in Washington, D.C., for a second "Million MAGA March," (though, again, the actual number of Trump followers

who attended was in the thousands). Again, Trump supported the rally, tweeting on the morning of December 12, "WE HAVE JUST BEGUN TO FIGHT!!!"

34. As before, members of far right-wing hate groups appeared at the second "Million MAGA March," and Trump followers clashed with D.C. police, at least eight of whom were injured. Four people were stabbed. The police made over thirty arrests, including ten arrests for assault on a police officer, eleven arrests for simple assault, one arrest for assault with a deadly weapon, and two arrests for possession of a prohibited weapon.

35. Officials warned Trump that his incendiary rhetoric about the election could cause injury or death, but he persisted. On December 1, 2020, as Trump placed increasing pressure on Georgia election officials to overturn the state's results which favored Joe Biden, one Republican Georgia official, Gabriel Sterling, gave a press conference in which he reported on death threats made to Georgia election workers, and addressed Trump, saying, "Mr. President, you have not condemned these actions . . . . This has to stop . . . . Stop inspiring people to commit potential acts of violence. Someone is going to get shot, someone is going to get killed. And it's not right." Despite this, Trump never condemned the threats made against Georgia election officials, and four days before the January 6 insurrection, he implored Georgia Secretary of State Brad Raffensperger to "find" enough votes to swing the election in his favor.

36. As his efforts with state officials and in the courts failed, Trump began to focus on January 6, 2021, the date Congress was set to count the state-certified election results.

37. On December 15, 2020, the Trump campaign made payments to Event Strategies Inc., the firm that would be named as the production vendor on the permit application for the January 6 rally on the Ellipse.

38.     On December 19, 2020, Trump began promoting a January 6 rally to his followers:



39.     Trump's December 19th tweet about the January 6 rally was understood by many of his

supporters as a literal call to arms. For example, within minutes of Trump posting this

tweet, it was shared on a pro-Trump website called TheDonald.win, with the title:

"Trump Tweet. Daddy Says Be in DC on Jan 6." One user, "EvilGuy," said in response

to Trump's call to action, "I will be open carrying and so will my friends. We have been

waiting for Trump to say the word. There is [sic] not enough cops in DC to stop what is

coming."



40.     Other users on TheDonald.win commented that they understood Trump's tweet to be

"marching orders." One user said, "doesn't matter if they steal the election, if patriots

burst into the building by the thousands and cut the heads off the hydra." Another said,

"Storm the People's House and retake from the fuckin' commies."  "We've got marching

orders, bois," read one post. "He can't exactly openly tell you to revolt. This is the closest

he'll ever get," read another, to which came the reply, "Then bring the guns we shall." A user called "loveshock" wrote:



– **loveshock** 3 points 1 hour ago +7 / -4
Cops don't have "standing" if they are laying on the ground in a pool of their own blood.

41.   Law enforcement investigations have uncovered communications from Kelly Meggs, the self-described leader of the Florida chapter of the Oath Keepers, revealing that within days, supporters—based on Defendant Trump's call that the rally will be wild—began plotting traveling to Washington, D.C. "to insurrection." Contemporaneous communications from Meggs indicated he knew the January 6 event would be no mere "rally," and that the Proud Boys, Oath Keepers, and other militia members were discussing how to, as described by Meggs, "work together and shut this shit down."

42.   Another militia group with ties to Trump and his advisors was also foreshadowing violence.  On January 4, the Twitter account of the militia group called 1st Amendment Praetorian posted that "[t]here may be some young National Guard Captains facing some very, very tough choices in the next 48 hours. Pray with every fiber of your being that their choices are Wise, Just, and Fearless." Members of the group were listed as "demonstration marshals" on the permit for the January 5th rally at Freedom Plaza.

43.   In the week before January 6, Trump repeatedly encouraged his followers to attend the event and continually referred to "Stop the Steal."



44.     Law enforcement investigations have uncovered location, cellular, and call record data indicating that in the days just before the January 6 insurrection, a member of the Proud Boys was in communication with a person associated with the White House.

45.     On the evening of January 5, Trump made several calls to loyal personal and campaign advisers who were gathered in a "war room" at the Willard Hotel in Washington, D.C., working to overturn the results of the 2020 election. These advisers included Rudy Giuliani, Trump's personal lawyer; John Eastman, a scholar working on a baseless legal strategy to deny Joe Biden the presidency; Boris Epshteyn, a senior campaign aide; Jason Miller, a senior adviser to the campaign; Steve Bannon, Trump's one-time White House chief strategist; and Michael Flynn, Trump's one-time national security adviser. On at least one of those calls, Trump discussed ways to stop Congress's joint session to ensure Biden would not be certified as president on January 6.

46.     Also at the Willard on January 6 were other members and leaders of violent militias who were involved in the insurrection. On the morning of January 6, members of the Oath Keepers were seen outside the Willard, accompanying Trump loyalist and pardoned criminal Roger Stone. Oath Keepers had also accompanied Stone as he spoke at pro-Trump rallies in Washington, D.C. on January 5, and had driven him around Washington.

47.   Robert Patrick Lewis, the founder and leader of the militia group 1st Amendment

Praetorian, was also at the Willard on January 6. Lewis tweeted, "Today is the day true

battles begin" and "You can only apply so much pressure to a system before it explodes."

48.   The day before the January 6 session of Congress and the day of, Trump gave his

followers further motivation to take matters into their own hands, as he promoted the

baseless idea that Vice President Mike Pence could (but might refuse to) single-handedly

reject the election outcome based on false claims that some states wanted to "decertify"

or "correct" election results that were not in Trump's favor.







49.  Trump's 2020 campaign, along with its joint fundraising committees, made more than

$3.5 million in direct payments to people and firms involved in the Washington, D.C.

demonstrations on January 6.

50.  In the weeks between the election and the storming of the Capitol, Rep. Paul Gosar (R-

AZ) gave planners and organizers several assurances they would receive "blanket

pardons" after staging protests against the election results.

51.  Trump's continued campaign to incite his followers to violently overturn the results of

the election reflected the fact that under the U.S. Constitution, the President's official

responsibilities do not include determining the outcome of a presidential election. All his

conduct inciting his followers was conducted in his personal capacity as a candidate for

elected office, not in any official capacity as President.

52.  The Constitution prescribes that the selection of electors shall be determined by "each

state." U.S. Const. art. II, sec. 1, cl. 2. The Constitution prescribes no role for the sitting

president in their selection.

53.     The selection of the next president is made by the electors when they "meet in their respective states and vote by ballot for President and Vice-President." U.S. Const., amend. XII. The Constitution prescribes no role for the sitting president in determining the outcome of that vote.

54.     The Framers were so committed to excluding the sitting president from a role in the selection of the next president that they prohibited electors from holding an Office of Trust or Profit under the United States, U.S. Const. art. II, sec. 1, cl. 2, lest those electors otherwise "be suspected of too great devotion to the President in office." The Federalist No. 68 (Alexander Hamilton).

55.     The Constitution prescribes that the counting of the votes that are cast and certified by the Electors in their respective states shall be conducted by the President of the Senate in the presence of the Senate and House of Representatives. The Constitution prescribes no role for the sitting president in determining the outcome of that count either.

**E.      Incited by Trump, his followers attack the Capitol on January 6, 2021**

56.     On January 6, 2021, thousands of Trump's followers congregated on the National Mall near the White House. Many were armed members of far right-wing hate organizations like the Proud Boys. Trump issued a directive for Republicans to "FIGHT" early in the day:



57.   USCP Officer PFC Marcus Moore was not scheduled to work on January 6, 2021, but he was called on January 5 and told to report to work the following day.

58.   Officer Moore expected he would be needed for several hours and then be able to return home. Instead, Officer Moore's day started at 5:30 a.m., and he would not leave the Capitol until 10:30 p.m.

59.   At 5:30 a.m. on January 6, 2021, Officer Moore reported to his normal post at the Madison Building. Though the Madison Building was quiet throughout the morning, he could tell what was developing outside the Capitol was not a normal protest.

60.   Beginning at 7 a.m., speakers took to the stage at the Ellipse, just south of the White House, where thousands of protesters had gathered to listen. The rally was broadcast live on several news outlets, and could be watched streaming over the internet, and could therefore be watched by those protesters who were not on the Ellipse itself, including those already near the Capitol. Numerous Trump allies spoke before Trump took the stage, all of whom repeated the message that the election had been stolen, that the

country as they knew it was about to fall, and that it was up to the crowd to save the country, in the words of Trump's personal attorney Rudy Giuliani, in a "trial by combat."

61.     The rally at the Ellipse was a private event, organized in part by Trump's former campaign staff. As the *Wall Street Journal* reported, the event was "arranged and funded by a small group including a top Trump campaign fundraiser and donor facilitated by far-right show host Alex Jones."

62.     Organizers of the Ellipse rally used difficult-to-trace "burner phones" for planning conversations and high-level communications with Trump's team. Burner phones are cheap, prepaid cell phones designed for temporary usage. They do not require users to have an account. This makes them hard to trace and ideal for concealing criminal activity.

63.     Trump's aides were warned that the January 6 events could turn chaotic, with tens of thousands of people potentially overwhelming ill-prepared law enforcement officials.

64.     Trump took the stage at noon on January 6, 2021. In an hour and fifteen-minute speech, Trump repeatedly claimed that the election had been "rigged" and "stolen," and said:

- "They rigged it like they've never rigged an election before;"

- "We will never concede, it doesn't happen. You don't concede when there's theft involved. Our country has had enough. We will not take it anymore and that's what this is all about. To use a favorite term that all of you people really came up with, we will stop the steal;"

- "When you catch somebody in a fraud, you're allowed to go by very different rules;"

- "You'll never take back our country with weakness. You have to show strength, and you have to be strong;"

- "And we fight. We fight like hell. And if you don't fight like hell, you're not going to have a country anymore;"

- "And we're going to the Capitol . . . . But we're going to try and give our Republicans, the weak ones because the strong ones don't need any of our help. We're going to try and give them the kind of pride and boldness that they need to take back our country."

65.   As he was making these remarks, Trump's followers on the Ellipse began chanting "Fight
      like Hell" and "Fight for Trump." After he was done speaking, the chants changed to,
      "Storm the Capitol," "Invade the Capitol Building," and "Take the Capitol right now."

66.   While Trump was speaking, at 12:49 p.m., Capitol Police responded to a report of a
      possible explosive device at the Republican National Committee Headquarters, which
      was later identified as a pipe bomb. Shortly afterward, a second pipe bomb was found at
      the headquarters of the Democratic National Committee. Both were three blocks from the
      Capitol.

67.   As Trump concluded his speech near the White House, his followers who were already at
      the Capitol became insurrectionists. Thousands of them broke through police barricades
      and stormed up the steps of the Capitol on both fronts of the building, attacking and
      injuring police officers, including the Plaintiffs. The insurrectionists finally entered the
      Capitol itself, intent on committing further acts of violence against elected officials,
      where the insurrectionists continued to attack police officers. Many of these
      insurrectionists have since been charged with crimes.

68.   Some of these protesters broke through the outer perimeter of barricades west of the
      Capitol building while Trump was still speaking, at 12:53 p.m. By 1:03 p.m., they had
      pushed Capitol Police onto the west Capitol steps. Many of them wore Trump hats and
      shirts, waved Trump flags, and bore Trump insignia around their necks. As the
      insurrectionists began battling with police, one was overheard saying, "It's us versus the
      cops!" A man yelled at police through a megaphone plastered with stickers from
      "InfoWars," a website operated by the right-wing conspiracy theorist Alex Jones, "You
      are traitors to the country!"

69. At 1:00 p.m., Capitol Police Chief Steven Sund called for backup from the Metropolitan Police Department, which deployed approximately 100 officers to the Capitol grounds within minutes. Shortly thereafter, Chief Sund asked House Sergeant at Arms Paul Irving and Senate Sergeant at Arms Michael Stenger to declare an emergency and call for the deployment of the National Guard.

70. The news had been on in the officers' break room at the Madison Building all morning and early afternoon. Officer Moore could hear real-time updates on his radio that there were large numbers amassing on the West Front of the Capitol. As he listened, the aggression escalated from yelling and kicking bike rack barriers, to throwing bike racks, and finally to breach of the barriers at the base of the West Front steps.

71. Officer Moore heard typical radio etiquette giving way to virtual play-by-play of the escalating violence, culminating with one of the lieutenants loudly reporting "WE'RE GETTING CRUSHED."

72. Just after 1 p.m., Officer Moore and his USCP colleagues were ordered to clear the Madison Building, as the violence across the street at the Capitol continued to increase.

73. Officer Moore's sergeant, Sergeant Vargas said, "we're going over," and a small number of officers, including Officer Moore, left the Madison building and walked to the East side of the Capitol.

74. One of Officer Moore's colleagues brought a CDU (Civil Disturbance Unit) gear bag with them. Officer Moore carried the gear as he walked onto the Capitol Plaza, and an insurrectionist shouted to him, "we have 40,000 people, that won't help."

75. Officer Moore made his way to the bike rack barriers in front of the East Front of the Capitol, which had been set up to maintain a perimeter around the building.

76.     The crowd on the East Front had grown throughout the 1 o'clock hour. Officers were spaced out along the line of bike racks, responding to protesters' periodic attempts to push through the bike racks.

77.     By 1:30 p.m., on the West Front of the Capitol, Capitol Police officers were forced by insurrectionists to the top of the Capitol steps. Meanwhile, Trump's speech had ended, and many more thousands of protesters began marching toward the Capitol. About forty percent of the phones tracked near the rally stage on the National Mall during the speeches were found in and around the Capitol during the insurrection, showing that many of those who were listening to Trump's speech followed his direction to march on the Capitol.

78.     At around 1:45 p.m., the insurrectionists overcame the Capitol Police officers protecting the Capitol's west steps, and the officers pulled back into the Capitol itself.

79.     Officer Moore heard in real time on his radio when the officers on the West Front were overcome, and immediately after, just before 2 p.m., the crowd began to swell and surge on the East Front.

80.     A wave of insurrectionists attacked the plaza steps, slamming the barriers onto the steps. Due to the size and aggressiveness of the crowd (some of whom were swinging 2x4s), Officer Moore and his colleagues were quickly outnumbered.

81.     As people dressed in Trump gear and carrying large Trump flags stormed through the barriers, Officer Moore knew he and the other officers would be unable to hold them against the relentless pushing and shoving.

82.     Officer Moore ran toward the Rotunda stairs on the East Front to try to stop the crowd, but it was too late, and the crowd was too large and aggressive.

83.     As the crowd chased other USCP officers to the top of the Rotunda stairs, he and a small

        number of officers made their way toward the Capitol entrance below those stairs.

84.     At 1:49 p.m.,[1] after Trump had returned to the White House and was reportedly watching

        on TV as events were unfolding at the Capitol, he tweeted out the entirety of his speech:



85.     At 1:59 p.m., insurrectionists pushed Capitol Police to the top of the east Capitol steps,

        and by 2:10 p.m., insurrectionists began attempting to break into the building through

        windows on the west side.

86.     The Proud Boys made up a large portion of the first wave of insurrectionists to breach the

        Capitol and assault Capitol Police. Proud Boys also took deliberate steps to prevent the

---

[1] On January 8, 2021, Twitter permanently suspended Donald Trump's personal account, removing his tweets from view. Publicly available archives of Trump's tweets are limited and as a result, some of the images of Trump's tweets used in this Complaint, such as the one in this paragraph, feature timestamps from other than the Eastern Time Zone.

Capitol Police from securing the Capitol against unlawful entrants. And Proud Boy

Dominic Pezzola, who was one of the first rioters to gain entrance into the Capitol after

he used a Capitol Police shield to break a window, stated on a video subsequently posted

to social media: "Victory smoke in the Capitol, boys. This is fucking awesome. I knew

we could take this motherfucker over [if we] just tried hard enough."

87.     An FBI Special Agent later submitted an affidavit in support of a criminal complaint

against Pezzola stating that Pezzola was part of a group that "said that anyone they got

their hands on they would have killed, including Nancy Pelosi," and that they "would

have killed [Vice President] Mike Pence if given the chance."[2]

88.     As Officer Moore approached the Memorial Door at the entrance below the Rotunda, he

heard a large explosion that sounded like it was on the Rotunda steps. Because he knew

there had been two live bombs found at the Republican and Democratic National

Committee buildings just hours before, he feared and believed someone had detonated a

pipe bomb. He heard three more explosions of flashbangs detonated by insurrections so

close to him that he was left temporarily deaf. As his hearing returned, his ears continued

ringing.

89.     Officer Moore was able to get inside the Capitol building but as he entered, an

insurrectionist with a backpack tried to follow him inside. Officer Moore and the officers

with him pulled the doors closed behind them because he feared the insurrectionist had a

bomb. After successfully closing the door, Officer Moore was prepared for the door to

explode behind him. To this day, he does not know what was in the insurrectionist's

backpack.

---

[2] (Brackets in original).

90.   As soon as he entered through the Memorial Door, he heard over his radio "the Capitol has been breached," and at Sergeant Vargas's direction, he followed another officer up to the House chambers, planning to do everything he could to keep the members of Congress in the chambers safe from the insurrectionists.

91.   By 2:12 p.m., the insurrectionists entered the building through broken windows on both sides of the Capitol, opening up a door for additional insurrectionists to enter.

92.   The insurrectionists acted as though they knew the Capitol's vulnerabilities. Many of the Capitol's 658 single-pane windows had been reinforced with metal and bomb-resistant glass a few years prior, but renovators skipped about a dozen ground-floor windows, including some installed in doors, because they were deemed low risk or structurally unfit for reinforcement. Some of the first insurrectionists to break through the police line ran past 15 reinforced windows—they aimed instead for unreinforced areas. Four of the dozen unreinforced ground-floor windows and doors became major access points that the insurrectionists used to break into and overtake the Capitol. Every reinforced window that was attacked by insurrectionists remained intact.

93.   Some of those who entered had guns. Some were in helmets and tactical gear. Many carried baseball bats, Trump flags, hockey sticks, fire extinguishers, lumber, stolen police shields, collapsible batons, and other weapons.

94.   Shortly thereafter, Vice President Pence was removed from the Senate chamber and the Senate was called into recess. Capitol Police confronted the insurrectionists but were greatly outnumbered. Outside the Capitol, the mob shouted, "Hang Mike Pence!" and had erected a gallows.

95.     Inside the Capitol, the insurrectionists continued to physically attack Capitol Police, while taunting them, saying, among other things, "You're outnumbered. There's a fucking million of us out there. And we are listening to Trump—your boss," "We can take you out," and, "We were invited here by the President of the United States." As U.S. Capitol Police sergeant Aquilino A. Gonell later testified before the House Select Committee to Investigate the January 6th Attack on the U.S. Capitol: "All of them—all of them were telling us, 'Trump sent us.'"

96.     Officer Moore was not familiar with the inside of the Capitol so he followed fellow officers through the hallways and stairs to a vestibule outside the House Chambers.

97.     Officer Moore was one of nine officers guarding the House Chambers doors. At first, one insurrectionist appeared, then two. The numbers quickly swelled to fifty, then one hundred or so.

98.     Sergeant Vargas and an inspector stepped in front of the mob and tried to reason with them. But the insurrectionists had figured out that they were directly outside the House Chambers and that only these officers stood between them and the objective of their attack.

99.     The mob suddenly rushed Officer Moore and the other officers, as the officers back pedaled toward the vestibule to the House chambers.

100.    The insurrectionists crushed Moore against the wall. The combination of the crush of people pinning him to the wall and overwhelming chemical odor from bear spray and other chemicals, made it difficult for him to breathe.

101.    The insurrectionists threw fire extinguishers, poles, and other objects, and struck the officers with their fists.

102.    Insurrectionists shouted at Moore and the officers to join them, screaming "we stood up for you," even as they attacked him. Others shouted, "take their guns and kill them."

103.    The insurrectionists were armed and organized. Officer Moore could see one was armed carrying a gun, and some were carrying and using radios.

104.    Officer Moore was focused on surviving as he calculated the risk that if he drew a weapon or fought back in the vestibule outside the House Chamber, it could cost him and his fellow officers their lives.

105.    He feared the mob was so intent on violence, he might not make it home alive.

106.    He shouted to his colleague, Officer Hines, "WE ARE NOT GOING TO DIE LIKE THIS," but they were badly outnumbered.

107.    On the other side of the doors Officer Moore was pinned against, officers had their service weapons drawn as they protected the House Chambers from the inside. Officer Moore had the added fear that he was in danger from inside the Chambers, should the officers use their firearms if the insurrectionists advanced any further.

108.    As Officer Moore attempted to protect himself and the House from the insurrectionists, Trump watched the events unfold on live television. Those who were with him claimed that Trump was "delighted" and was "confused about why other people on his team weren't as excited as he was." Others described Trump as "borderline enthusiastic" about the unfolding violence.

109.    The insurrectionists were clad in and carrying Trump, QAnon, Proud Boys, and Oath Keepers-themed clothing, hats, and flags. Law enforcement investigations have since revealed that Jessica Marie Watkins, a member of the Oath Keepers, stated on an Oath

Keeper communication channel during the insurrection that "We have a good group . . . .
We are sticking together and sticking to the plan."

110.    In a phone call to the White House, House Minority Leader Kevin McCarthy begged
Trump to call off the insurrectionists, pleading with him that the rioters were all Trump
followers. Trump refused to do so, and told McCarthy, "Well, Kevin, I guess these
people are more upset about the election than you are."

111.    Sen. Ben Sasse has stated that White House officials reported that Trump was "delighted"
to hear of the Capitol break-in and further that he was excited that rioters were "pushing
against Capitol Police trying to get into the building."

112.    As Trump watched his followers (to whom he had lied when he told them that he would
be joining them in walking to the Capitol) terrorize the Capitol and attack the police who
guarded it, Trump's advisors, family members, and Fox News personalities urged him to
make a statement calling on his followers to stop. Trump chose not to condemn the
attack. Instead, at 2:24 p.m., Trump tweeted, and further incited his followers against his
own Vice President whose life was being threatened:



113.    An insurrectionist at the Capitol read this tweet aloud from the steps of the Capitol.

Insurrectionists then chanted, "Mike Pence is a traitor," and continued their assault.

Another insurrectionist later said, "Once we found out Pence turned on us and that they

had stolen the election, like officially, the crowd went crazy."

114.    Then, at 2:38 p.m., an hour after the first breach, Trump still chose not to call off the

attack, but instead issued a banal statement of support for law enforcement, and stated,

"stay peaceful" when he could see that his followers at the Capitol were anything but.



115.    Eventually, Sergeant Vargas directed Officer Moore to help get the members of Congress

out of the House chambers. Another USCP officer who was familiar with the Capitol

Building took Officer Moore to the inside of the chambers.

116.    As they moved toward the chambers through a hallway, Officer Moore heard a gunshot.

He had no idea who had fired the gun or whom had been shot.

117.    What he heard, at around 2:44 p.m., was the shot that killed Air Force veteran and Trump

follower Ashli Babbitt as she attempted to climb through a broken window in a set of

locked doors that led to where House members were fleeing.

118.    When Officer Moore heard the gunfire, he instinctively drew his service weapon and was certain he was going to end up in a gun battle. But he holstered his gun and continued with renewed urgency to evacuate the House. He had the instinct to look at his phone, on which he had been receiving calls and text messages that he could neither answer nor review. The only message he saw was from his pastor, which reinforced his resolve to ensure his, his colleagues and the House members' safety.

119.    As he ushered members to an internal relocation site, one member said he was feeling chest pain. Officer Moore placed him in a rolling desk chair and pushed him down the hallway toward safety.

120.    Officer Moore continued to evacuate and help protect members of Congress who were sheltering in the Ways and Means room. He remained locked down in the Ways and Means room with members for hours.

121.    By 3:00 p.m., the District of Columbia local government issued a notice of an emergency citywide curfew to begin at 6 p.m.

122.    Meanwhile, Trump's followers at the Capitol shouted, "We want Trump!" They attacked officers with rocks, bottles, fire extinguishers, metal poles, bear spray, and pepper spray. Officers reported being "flanked" and "los[ing] the line." For hours, officers were forced into hand-to-hand combat to prevent more rioters from entering the Capitol.

123.    At 4:17 p.m., Trump tweeted a recorded video directed to his followers as they continued to ransack the Capitol. In the video, Trump told the insurrectionists, "I know your pain, I know you're hurt," and repeated his "big lie" about the stolen election that had driven the insurrectionists to the Capitol in the first place. He then said to his followers, who had invaded the Capitol, assaulted and severely injured police officers, destroyed property,

and generally tried to overthrow the Congress as it carried out its duty of certifying a
presidential election: "Go home. We love you. You're very special."

124.    At around 5:40 p.m., Capitol Police, with reinforcements from the Metropolitan Police
and the National Guard, finally were able to begin to clear the Capitol. By that time, 140
police officers were physically hurt, and many more would be emotionally scarred. One
Capitol police officer suffered a fatal stroke linked to the events of January 6 and two
others took their own lives shortly thereafter.

125.    After the world had just watched the insurrectionists attack police, threaten members of
Congress, and destroy property within the Capitol, Trump explained the day's events,
once again reiterating his "big lie" and celebrating his followers' actions:



126.    At approximately 7 p.m., Trump's agent Rudolph Giuliani attempted to leave a voicemail
for Sen. Tommy Tuberville (but then left the voicemail in another Senator's voicemail
box, who then subsequently released the messaged to the press) requesting that Sen.

Tuberville "try to just slow [the congressional vote] down . . . so that we can get ourselves into tomorrow."

127.   At about 10:00 p.m., Officer Moore was finally able to leave the Capitol.

128.   As he walked out of the Capitol, his ears rang, his skin and throat burned, and his body ached. The Capitol was bathed in crime scene floodlights, SWAT teams and military, and a new perimeter.

129.   He was overcome by the cognitive dissonance between what he thought he had known about the world when he started work on January 6, and what he had experienced throughout the day. He said aloud to himself "What just happened? What country am I in?"

130.   Throughout the dangerous and chaotic day, it was not clear to him on January 6 that he would survive to make it home.

131.   He did finally get home just before midnight, only to be required to return for a 7 a.m. shift the next morning, which would be the beginning of a month of twelve- to sixteen-hour shifts. The two months that followed January 6 are a blur.

132.   Officer Moore suffered injuries to his body, including persistent tinnitus, a condition causing ringing in his ears. He continues to suffer a severe emotional toll in the wake of the January 6 insurrection.

133.   He is haunted by the memory of being attacked, and of the sensory impacts—most particularly the explosions of flashbangs and other devices, as well as the sights, sounds, smells, and even tastes of the attack remain close to the surface.

134.     The weight on Officer Moore has been heavy and inescapable. He has had sleep

disturbance and has difficulty discussing the traumatic events, despite having extensive

therapy.

135.     He suffered from depression that he could not address because he was too consumed with

a sense of obligation to continue with his professional responsibilities. Because the attack

happened in the place to which he reports daily, he is unable to avoid most of the triggers

of his emotional reactions.

136.     He has spoken with counselors to help manage the emotional impacts of being targeted

and of dealing with the level of aggression to which he was subjected.

**F.     Lawmakers in the Capitol Recognized Trump as the Instigator of the Attack**

137.     In the aftermath of the January 6 insurrection, leaders within Trump's own party publicly

said that Trump's "big lie" about the election and his provocation of his followers caused

the January 6 insurrection.

a.     In a February 18, 2021 statement, Sen. Mitt Romney (R-Utah) said, "I hear many

calls for unity. It is apparent that calling for unity while at the same time

appeasing the big lie of a stolen election is a fraud. It is the lie that caused the

division. It is in the service of that lie that a mob invaded the Capitol on January

6th."

b.     On January 12, 2021, Liz Cheney (R-Wyo.), then the third highest ranking

Republican in the House of Representatives, said, "The President of the United

States summoned this mob, assembled the mob, and lit the flame of this attack.

Everything that followed was his doing. None of this would have happened

without the President. The President could have immediately and forcefully

33

intervened to stop the violence. He did not. There has never been a greater

betrayal by a President of the United States of his office and his oath to the

Constitution."

c.  On Feb. 13, 2021, Senator Mitch McConnell (R-Ky.) said:

> There's no question, none, that President Trump is practically and morally responsible for provoking the events of the day.

> The people who stormed this building believed they were acting on the wishes and instructions of their president, and having that belief was a foreseeable consequence of the growing crescendo of false statements, conspiracy theories and reckless hyperbole which the defeated president kept shouting into the largest megaphone on planet Earth. He did not do his job. He didn't take steps so federal law could be faithfully executed and order restored. No. Instead, according to public reports, he watched television happily – happily – as the chaos unfolded. Even after it was clear to any reasonable observer that Vice President Pence was in serious danger.

McConnell also said:

> President Trump is still liable for everything he did while he was in office, as an ordinary citizen, unless the statute of limitations has run, still liable for everything he did while in office, didn't get away with anything yet – yet.

> We have a criminal justice system in this country. We have civil litigation. And former presidents are not immune from being held accountable by either one.

## G.   The Insurrectionists Have Since Stated They Stormed the Capitol at Trump's Direction

138.  Many of the rioters cited Trump's words and conduct as the inspiration for their violent

actions. For example, the day after the insurrection, Jacob Angeli Chansley (the "QAnon

Shaman") called the FBI to tell them that "he came as a part of a group effort, with other

'patriots' from Arizona, at the request of the President that all 'patriots' come to D.C. on

January 6, 2021." Later, Chansley's lawyer Al Watkins said in an interview, "Let's roll

the tape. Let's roll the months of lies, and misrepresentations and horrific innuendo and

hyperbolic speech by our president designed to inflame, enrage, motivate . . . What's really curious is the reality that our president, as a matter of public record, invited these individuals, as president, to walk down to the Capitol with him." He also said that Chansley "regrets very much having . . . just been duped by the president."

139.   Attorneys for Proud Boys member William Chrestman, said in court papers that Trump gave the mob "explicit permission and encouragement" to do what they did, providing those who obeyed him with "a viable defense against criminal liability." They further stated on Chrestman's behalf, "It is an astounding thing to imagine storming the United States Capitol with sticks and flags and bear spray, arrayed against armed and highly trained law enforcement. Only someone who thought they had an official endorsement would even attempt such a thing. And a Proud Boy who had been paying attention would very much believe he did."

140.   On January 20, 2021, after Proud Boys members were charged for their crimes, Proud Boys leader Ethan Norden said he was "facing jail time cuz we followed [Trump's] lead and never questioned it."

### H.  Trump's Statements Since the January 6 Attack

141.   Since January 6, 2021, Trump has continued to publicly praise, defend, and encourage his supporters who marched on and attacked the Capitol, and to spread baseless falsehoods about the 2020 election.

142.   On January 12, 2021, Trump called his Ellipse rally speech "totally appropriate."

143.   In a March 2021 interview, ABC News's Jonathan Karl asked Trump about the insurrectionists' chants to "hang Mike Pence!" during the attack on the Capitol. Trump responded, "well, the people were very angry" and "because it's common sense, Jon. It's

common sense that you're supposed to protect. How can you - if you know a vote is fraudulent, right? How can you pass on a fraudulent vote to Congress?"

144.   In another interview that month, Trump said of his supporters who marched to the Capitol: "Personally, what I wanted is what they wanted. They showed up just to show support because I happen to believe the election was rigged at a level like nothing has ever been rigged before."

145.   In July 2021, Trump said of the Ellipse rally: "These were peaceful people, these were great people."; "The crowd was unbelievable and I mentioned the word 'love,' the love in the air, I've never seen anything like it . . . . That's why they went to Washington."

146.   On September 16, 2021, before a "Justice for J6 rally" planned by a former Trump campaign staffer to protest the arrest and criminal prosecutions of hundreds of January 6 insurrectionists, Trump expressed support for those being prosecuted: "Our hearts and minds are with the people being persecuted so unfairly relating to the January 6th protest concerning the Rigged Presidential Election," Trump said in a statement put out through is political action committee. "In addition to everything else, it has proven conclusively that we are a two-tiered system of justice. In the end, however, JUSTICE WILL PREVAIL!"

## IV.   LIABILITY

### COUNT ONE
### (Directing Assault and Battery)

147.   Marcus J. Moore adopts and incorporates the prior paragraphs as if set forth fully herein and further states:

148.   Through his words and conduct described herein, Defendant, Donald J. Trump, directed and ratified the intentional torts of assault and battery committed by his followers on Marcus Moore.

149.   As the leader of this violent mob, who took their cues from his campaign rhetoric and personal Tweets and traveled from around the country to the nation's capital at Trump's invitation for the January 6 rally, Trump was in a position of extraordinary influence over his followers, who committed assault and battery on Marcus Moore.

150.   Trump, by his words and conduct, directed the mob that stormed the Capitol and assaulted and battered Marcus Moore.

151.   For several hours after the mob had stormed the Capitol, Trump had the continuing ability to issue statements, through traditional media and his personal Twitter account, but refused to communicate anything to his followers that might discourage their relentless assault and battery on Marcus Moore and their fellow officers at the Capitol. Trump thereby ratified the conduct of his followers and ensured that the assaults on the Plaintiff and fellow officers would last much longer, worsening the physical and emotional injuries of the Plaintiff and other officers.

152.   When he finally did make statements late in the afternoon, Trump further ratified the tortious conduct when he again said that the election had been stolen by fraud, and that his followers had every reason to be angry, and by announcing support, praise, and love for his followers.

153.   It appeared to Marcus Moore that Trump's followers then had the ability to carry out the harmful and offensive contact.

154.   The words and conduct of Trump's followers caused Marcus Moore to fear imminent physical harm.

155.   Trump's followers committed battery, and unlawfully and intentionally touched and used force on Plaintiff in a harmful, offensive, and insulting way.

156.   Trump's followers directly contacted, struck, put into motion objects that directly hit Marcus Moore, and sprayed him with chemical agents that burned his exposed eyes, face, and body.

157.   Marcus Moore suffered physical injuries because of the batteries to which he was subjected.

158.   Had Trump committed directly the conduct committed by his followers, it would have subjected Trump to direct liability.

159.   The unlawful and intentional acts that Defendant directed his followers to commit on January 6, 2021, were a direct and proximate cause of Marcus Moore's injuries, pain, suffering, and other damages.

## COUNT TWO
### (Aiding and Abetting Assault and Battery)

160.   Marcus J. Moore adopts and incorporates the prior paragraphs as if set forth fully herein and further states:

161.   Through his words and conduct described throughout this Complaint, Defendant, Donald J. Trump, aided and abetted the intentional torts of assault and battery committed by his followers on Marcus Moore, as described in Count One.

162.   Trump aided and abetted his followers' assault and battery on Marcus Moore through his suggestive words and encouragement leading up to and on January 6, 2021, which were spoken from his position as the leader of a powerful political movement, including a

private militia that was expressly "standing by" for his call to action, and gave his message extra weight.

163.  Trump's words and encouragement leading up to and on January 6, 2021, created a foreseeable risk of harm to Marcus Moore.

164.  Had Trump committed directly the conduct committed by his followers, it would have subjected Trump to direct liability.

165.  The unlawful and intentional acts that Trump aided and abetted his followers to commit on January 6, 2021, were a direct and proximate cause of Marcus Moore's injuries, pain, suffering, and other damages.

**COUNT THREE**
**(Violation of a Public Safety Statute: D.C. Code § 22-1322 – Inciting to Riot)**

166.  Marcus J. Moore adopts and incorporates the prior paragraphs as if set forth fully herein and further states:

167.  Defendant, Donald J. Trump, is per se liable for his violation of two District of Columbia public safety statutes on January 6, 2021.

168.  D.C. Code § 22-1322(b) makes it a criminal offense to willfully incite or urge other persons to engage in a riot.

169.  The statute defines a "riot" as "a public disturbance involving an assemblage of 5 or more persons which by tumultuous and violent conduct or the threat thereof creates grave danger of damage or injury to property or persons." D.C. Code § 22-1322(a).

170.  D.C. Code § 22-1322 was enacted to protect public safety officials and others from violence caused by rioting.

171.  Through his words in the months during the 2020 presidential election and speaking from his position as the leader of a powerful political movement, including a private militia

that was expressly "standing by," Trump planted the seeds to create a public disturbance which by tumultuous and violent conduct or the threat thereof would create grave danger or injury to property and persons.

172.   More particularly, on the morning of January 6, 2021, Trump addressed his followers at the rally at the Ellipse, and explicitly directed them to march to the Capitol.

173.   Defendant's followers, already primed by his months of inflammatory rhetoric, were spurred to direct action.

174.   Defendant's words and conduct violated D.C. Code §§ 22-1322(b) and were a cause of tumultuous and violent conduct that created grave danger of damage or injury to property or persons, including Marcus Moore.

175.   Defendant, by violating this statute, is liable per se and thereby liable for Marcus Moore's injuries and damages.

## COUNT FOUR
### (Violation of a Public Safety Statute:
### D.C. Code § 22-1321 (a)(1), (a)(2), and (b) – Disorderly Conduct)

176.   Marcus J. Moore adopts and incorporates the prior paragraphs as if set forth fully herein and further states:

177.   Defendant, Donald J. Trump, is per se liable for his violation of two District of Columbia public safety statutes on January 6, 2021.

178.    On January 6, 2021, there was in effect in the District of Columbia a statute that was enacted to protect Marcus Moore and persons in his position, and to prevent the type of events that are described herein.

179. D.C. Code § 22-1321 (a)(1) makes it unlawful, in any place open to the general public, for a person to intentionally or recklessly act in such a manner as to cause another person to be in reasonable fear that a person is likely to be harmed.

180. D.C. Code § 22-1321 (a)(2) makes it unlawful, in any place open to the general public, for a person to incite or provoke violence where there is a likelihood that such violence will ensue.

181. D.C. Code § 22-1321(b) makes it unlawful "for a person to engage in loud, threatening, or abusive language, or disruptive conduct, with the intent and effect of impeding or disrupting the orderly conduct of a lawful public gathering."

182. Marcus Moore is among the members of the class that the statute was enacted to protect.

183. Through his words in the months following the 2020 presidential election and speaking from his position as the leader of a powerful political movement, including a private militia that was expressly "standing by," Defendant planted the seeds that made likely the violence that was unleashed on Marcus Moore on January 6, 2021.

184. Defendant repeatedly asserted that he and his followers were victims of a massive fraud and conspiracy that had resulted in the theft of the 2020 Presidential election.

185. More particularly, on the morning of January 6, 2021, Defendant addressed his followers at the Ellipse, and explicitly directed them to march to the Capitol.

186. Defendant's words, when he spoke them, were words likely to produce violence in others.

187. Defendant's followers, already primed by his months of inflammatory rhetoric, were spurred to direct action.

188.  By directing his followers as he did leading up to and on January 6, 2021, Defendant intentionally and recklessly acted in such a manner as to cause Marcus Moore to be in reasonable fear that he was likely to be harmed.

189.  Defendant's provocative words and actions leading up to and on January 6, 2021, were likely to incite and provoke violence in others and did in fact incite and provoke violence directed at Marcus Moore.

190.  Defendant's loud, threatening, and abusive language and conduct leading up to and on January 6, 2021, were intended to and did impede and disrupt the orderly conduct of the lawful public gathering to count the certified electoral votes to declare Joe Biden the winner of the 2020 presidential election.

191.  Defendant's words and conduct in the months before and on January 6, 2021, violated D.C. Code § 1321 and were a cause of the violence that ensued in places in the District of Columbia open to the general public.

192.  Defendant's violation of D.C. Code § 1321 caused severe injury and damages to Marcus Moore.

193.  Defendant, by violating this statute, is per se liable for Marcus Moore's injuries and damages.

## COUNT FIVE
### (Punitive Damages)

194.  Marcus Moore adopts and incorporates the prior paragraphs as if set forth fully herein and further states:

195.  Trump's words and conduct leading up to and on January 6, 2021, and his ratification through silence when words and action were necessary, and his further ratification by

direct praise of the rioters, as set forth herein, demonstrated a willful and wanton

disregard for and a reckless indifference to Marcus Moore's safety and that of their

fellow officers.

196.    Trump's words and conduct leading up to and on January 6, 2021, were intentionally

tortious and in violation of federal and D.C. statutes.

197.    His words and conduct gave direction to and aided and abetted his followers in the

commission of the intentional torts of assault and battery that caused injury to Marcus

Moore.

198.    Those words and conduct incited the riot and disorderly conduct in violation of D.C. law

on January 6, 2021, that caused injury to Marcus Moore.

199.    Accordingly, Marcus Moore requests punitive damages in an amount consistent with the

evidence to be shown at trial against Trump to punish him for his intentional and wanton

and reckless conduct and to deter others from engaging in similar behavior.

### COUNT SIX
### (Conspiracy in Violation of 42 U.S.C. §1985(1))

200.    Marcus Moore adopts and incorporates the prior paragraphs as if set forth fully herein

and further states:

201.    The Reconstruction-era law known as the Ku Klux Klan Act, 42 U.S.C. §1985(1)

"Preventing Officer from Performing Duties," defines conspiracy to interfere with civil

rights:

> If two or more persons in any State or Territory conspire to prevent, by
> force, intimidation, or threat, any person from accepting or holding any
> office, trust, or place of confidence under the United States, or from
> discharging any duties thereof; or to induce by like means any officer of the
> United States to leave any State, district, or place, where his duties as an
> officer are required to be performed, or to injure him in his person or
> property on account of his lawful discharge of the duties of his office, or

> while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties[.]

202.   Under 42 U.S.C. §1985(3):

> [I]f one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

203.   On information and belief, Defendant Trump agreed and conspired with his followers to stage an attack on the Capitol to prevent Congress and Vice President Mike Pence, by force, intimidation, or threat, from discharging their duties of certifying the winners of the 2020 presidential election. Trump and his followers further agreed and conspired to prevent, by force, intimidation, or threat, Joseph Biden and Kamala Harris from accepting and/or holding their respective offices as President and Vice President. Trump and his followers further agreed and conspired to prevent, by force, intimidation, or threat the members of the Capitol Police from discharging their duties on January 6.

204.   As described more fully above, communications between the co-conspirators began as early as September 2020. The Proud Boys were then "standing by" on December 19, 2020, when Defendant Trump publicized the "Stop the Steal" Rally and called for attendees to "be there" as it "will be wild!".

205.   The Proud Boys, Oath Keepers, and other militia members then took overt acts in furtherance of a conspiracy to—in the words of Oath Keeper Kelly Meggs—"work together and shut this shit down." "[S]hut this shit down" referred to a plan to accomplish the objective of a Section 1985(1) conspiracy—using force, intimidation, and threats to prevent Congress and Vice President Mike Pence from discharging their duties of

certifying the winners of the 2020 presidential election; using force, intimidation, and threats to prevent Joseph Biden and Kamala Harris from accepting and/or holding their respective offices as President and Vice President; and using force, intimidation, and threats to prevent members of the Capitol Police from discharging their duties on January 6.

206.   Members of the conspiracy engaged in multiple meetings directed at accomplishing the object of the conspiracy; obtained paramilitary gear and supplies included tactical vests, protective equipment, and radio equipment; and took steps to remain incognito and mask their participation in the conspiracy.

207.   When the militia conspirators converged on the District of Columbia, Defendant Trump knowingly gave a speech urging them, among other things, that "when you catch someone in a fraud, you're allowed to go by very different rules" and "if you don't fight like hell, you're not going to have a country anymore," the natural and probable consequence of which would be to lead the mob to storm the Capitol and accomplish the objective of a Section 1985(1) conspiracy—using force, intimidation, and threats to prevent Congress and Vice President Mike Pence from discharging their duties of certifying the winners of the 2020 presidential election; using force, intimidation, and threats to prevent Joseph Biden and Kamala Harris from accepting and/or holding their respective offices as President and Vice President; and using force, intimidation, and threats to prevent members of the Capitol Police from discharging their duties on January 6.

208.   On information and belief, Defendant Trump intended the natural and probable consequences of the act he knowingly did, namely the use of force, intimidation, and

threats to prevent Congress and Vice President Mike Pence from discharging their duties of certifying the winners of the 2020 presidential election; the use of force, intimidation, and threats to prevent Joseph Biden and Kamala Harris from accepting and/or holding their respective offices as President and Vice President; and the use of force, intimidation, and threats to prevent members of the Capitol Police from discharging their duties on January 6. That intent, and approval of the events of January 6, is further confirmed by, among other things, his delight when hearing of the Capitol break-in as well as his excitement that militia members were pushing against Capitol Police trying to get into the Capitol Building.

209. When Proud Boy Dominic Pezzola stated that he knew that the Proud Boys could "take this motherfucker over [if we] just tried hard enough," he was referring to a common plan to accomplish the objective of a Section 1985(1) conspiracy—using force, intimidation, and threats to prevent Congress and Vice President Mike Pence from discharging their duties of certifying the winners of the 2020 presidential election; using force, intimidation, and threats to prevent Joseph Biden and Kamala Harris from accepting and/or holding their respective offices as President and Vice President; and using force, intimidation, and threats to prevent members of the Capitol Police from discharging their duties on January 6..

210. When Jessica Marie Watkins, a member of the Oath Keepers, stated on an Oath Keeper communication channel that "We have a good group . . . . We are sticking together and sticking to the plan," she was referring to a plan to accomplish the objective of a Section 1985(1) conspiracy— using force, intimidation, and threats to prevent Congress and Vice President Mike Pence from discharging their duties of certifying the winners of the 2020

presidential election; using force, intimidation, and threats to prevent Joseph Biden and Kamala Harris from accepting and/or holding their respective offices as President and Vice President; and using force, intimidation, and threats to prevent members of the Capitol Police from discharging their duties on January 6.

211. In leading an attack on the Capitol, the Defendant Trump's co-conspirators took overt acts in furtherance of their conspiracy with Defendant Trump. Those overt acts caused Marcus Moore to suffer severe injuries.

## COUNT SEVEN
### (Civil Conspiracy in Violation of Common Law)

212. Marcus J. Moore adopts and incorporates the prior paragraphs as if set forth fully herein and further states:

213. As described above, Defendant Trump conspired with the Proud Boys and others to, among other things, incite an unlawful riot on January 6 with the goal of disrupting congressional certification of President Biden's electoral victory.

214. In furtherance of that conspiracy, one or more conspirators engaged in a riot and stormed the Capitol on January 6.

215. As a direct, proximate, and foreseeable result of that conspiracy, Marcus Moore suffered severe injuries.

## V.   PRAYER FOR RELIEF

WHEREFORE, Marcus Moore demands an award of the following relief:

a.     Judgment against Donald J. Trump on all Counts set forth herein;

b.     Compensatory damages in an amount consistent with the evidence to be shown at trial, in excess of $75,000 for each of them, plus interest and costs;

c.    Punitive damages in an amount consistent with the evidence to be shown at trial, plus interest and costs;

d.    Costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988, and

e.    Such other relief as the Court and jury deem necessary and just.

Respectfully submitted,

/s/ Patrick A. Malone
Patrick A. Malone (Bar No. 397142)
Daniel Scialpi (Bar No. 997556)
Heather J. Kelly (Bar No. 453154)
PATRICK MALONE & ASSOCIATES, P.C.
1310 L Street, N.W., Suite 800
Washington, D.C. 20005
P:  202-742-1500
F:  202-742-1515
pmalone@patrickmalonelaw.com
dscialpi@patrickmalonelaw.com
hkelly@patrickmalonelaw.com

Anne Tindall (Bar No. 494607)
Cameron Kistler (Bar No. 1008922)
Erica Newland (*application for admission to the D.C. Bar and this Court pending*)
* Jacek Pruski (*application for admission forthcoming*)
UNITED TO PROTECT DEMOCRACY
2020 Pennsylvania Ave. NW, #163
Washington, D.C. 20006
P: 202-579-4582
anne.tindall@protectdemocracy.org
cameron.kistler@protectdemocracy.org
erica.newland@protectdemocracy.org
jacek.pruski@protectdemocracy.org

John Paredes (Bar No. NY0418)
UNITED TO PROTECT DEMOCRACY
115 Broadway, 5th Floor
New York, N.Y. 10006
P: 202-579-4582
john.paredes@protectdemocracy.org

48

Benjamin L. Berwick (Bar No. MA0004)
UNITED TO PROTECT DEMOCRACY
15 Main St., Suite 312
Watertown, MA 02472
P: 202-579-4582
ben.berwick@protectdemocracy.org

## JURY DEMAND

The Plaintiffs demand trial by jury.

/s/ Patrick A. Malone
Patrick A. Malone, Esq.